**Opinion issued August 6, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-18-00824-CR

_____

**AVERY LYNN JONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1495266**

---

### MEMORANDUM OPINION

A jury convicted appellant, Avery Lynn Jones, of the first-degree felony

offense of murder and assessed his punishment at sixty years' confinement.[1] In three

issues, appellant contends that the trial court erred by (1) refusing to submit his

---

[1]    *See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2).

requested instructions on self-defense and defense of a third person; (2) failing to suppress his oral statement to police because the statement was not voluntary; and (3) refusing to grant his motion for mistrial made after the State violated a motion in limine by mentioning that he made a statement to police.

We affirm.

## Background

### A.    *Factual Background*

The complainant, Chevey John Leal, was married to Jessica Leal for approximately sixteen or seventeen years, and they had a house in the southwest Houston area. The couple had three biological children, and Jessica had a son from a previous relationship whom Leal never formally adopted. Leal and Jessica had marital troubles, and Leal began confiding in his sister, Mary Lou Nimmons, about these problems around Christmas Eve 2015. Around this time, Leal and Jessica separated. Leal and the children were predominantly living with Jessica's parents, while Jessica sometimes stayed with them and sometimes stayed elsewhere. However, Leal regularly returned to his and Jessica's house, where he worked out of the house repairing washing machines and dryers.

In early January 2016, Nimmons accompanied Leal to a legal clinic because Leal planned to seek a divorce from Jessica and wanted to obtain sole custody of the children. The representative at the legal clinic told Leal that the clinic could help

with the three youngest children, who were Leal's biological children, but could not help with the oldest child, who was not. According to Nimmons, Leal still planned to seek a divorce from Jessica, but he was trying to find a way that he could keep all four children together and with him. Nimmons never witnessed any violent or angry exchanges between Leal and Jessica, although she testified that, around the beginning of 2016, Leal did not want to go to their home by himself to gather personal belongings, so he called the police. Nimmons stated, "He didn't want to have any interaction with her."

On January 12, 2016, Nimmons received a call from Leal, who was "very excited." Jessica had just purchased a new phone, and she had left her old phone at their house. Nimmons testified that Leal "was very excited because there was a lot of stuff in there [on Jessica's old phone] that Chevey felt could help him gain custody of the kids." Leal and Nimmons met at Nimmons's house that evening, and Leal showed her the contents of Jessica's phone. While Leal was at Nimmons's house, he called "Avery."[2] Leal went home that evening, but he left Jessica's old phone with Nimmons "[t]o keep it safe." Nimmons later turned this phone over to police investigators.

---

[2] The State asked Nimmons if she knew who "Avery" was, and Nimmons stated, "Only that it was one of Jessica's boyfriends." After she gave this answer, defense counsel objected on hearsay grounds, and the trial court sustained the objection. Nimmons later testified that appellant was one of the men Jessica "was around" at the time she and Leal separated.

Jesse Lambert had been friends with Leal since they were in high school, and, around December 2015 and January 2016, he and Leal spoke on the phone nearly every day. Lambert was aware of Leal and Jessica's marital troubles, and he knew that Leal and the children were generally staying with Jessica's parents. On January 13, 2016, Leal called Lambert around 9:00 a.m. while Lambert was at work. During the beginning of the conversation, Leal was in a "regular mood," talking about dropping the children off at school and asking Lambert how his day was going, while he was doing his own work on washing machines and dryers. During their conversation, Leal informed Lambert that Jessica had arrived at the house, and Leal's mood changed to "[a] somber mood, kind of bummed-out mood." Lambert could hear a woman's voice over the phone line, but he could not identify that voice.

After hearing a woman's voice, Lambert could hear a discussion and "faint conversation." At this time, no one spoke with raised voices, and Lambert could not hear any banging noises or anything "that sounded violent or physical." Later, Leal began speaking with Lambert again, and at that point, he sounded excited. Leal told Lambert, "He's got a gun," and then he said, "I'm out of here, call 911, you got my back." Lambert did not know who Leal was referring to when he said "he," but Lambert was able to hear a male voice over the phone line.

Lambert had been speaking to Leal on his personal cell phone, but when Leal told him to call 911, he kept the line open on his personal cell phone and used his

4

work cell phone to call 911. Lambert testified, "I'm talking to 911, I hear a shot, I hear Chevey wailing, I'm trying to give information to 911 and then multiple shots after that." Lambert could hear multiple gunshots, but he could not recall how many he heard. On the line he had open with Leal, Lambert called Leal's name. He heard "rustling," or a sound as if a cell phone was placed in a pocket, and "then after that [Lambert heard] music and then a car door and that's it." Lambert called Leal's name a few more times, hung up when he received no response, and immediately called Leal's phone back. That call went straight to voicemail. Lambert then drove over to Leal's house. When he arrived, police were already there. Lambert gave two written statements to officers while at the scene.

Harris County Sheriff's Department Deputy J. Coddou was the first officer to arrive at Leal's house. When he and other deputies entered the house, they found Leal lying face-down on the floor in a doorway and short hallway between the master bedroom and the master bathroom, and it was not immediately clear if he was still alive. Leal was partially lying on his left arm, and his right arm was stretched out above his head. Coddou could see that the back of Leal's shirt was red and that there were small holes in his shirt. There were bloody footprints on the carpet near Leal's body in both the bathroom and the bedroom. There was also a knife lying next to Leal's left hand, there were multiple spent cartridge casings on the floor, a chair and vase were knocked over, and there was a broken picture frame. Coddou testified that

5

it appeared as though the master bathroom was the only place in the house where a struggle had taken place. EMS personnel determined that Leal had passed away, and he was not transported to the hospital.

Deputy Roy Glover, with the Harris County Sheriff's Department's crime scene unit, processed the scene for evidence. He took pictures of two knife sets located in the kitchen "because we had a knife at the scene next to the complainant." Ten spent cartridge casings were located near Leal's body, in the bathroom and in the short hallway that led to the master bedroom. Leal had injuries on his thumb and finger that "appeared to be made with a sharp object." Glover stated that Leal's shirt was "saturated" with blood, and he observed three gunshot wounds to Leal's back. Glover agreed that the knife found next to Leal had the "same sort of handle" as knives found in the kitchen, and he stated that was significant because it "most likely" showed "that the knife came from the house and that it wasn't brought into the house." He tested the knife for fingerprints but "[n]o prints of value were developed" that could be compared with prints from a known individual.

The autopsy performed on Leal revealed that he had "some sharp-force injuries" on his hands, including incisions and punctures. Dr. Michael Condron, who performed the autopsy, agreed that it was possible that these wounds "could have occurred with somebody being in a defensive state." Leal sustained nine gunshot wounds, one to the back of the neck, three to the upper back, two to the mid back,

6

one to the lower chest, one to the right side, and one to the back of the left shoulder. He did not have any stab wounds on his sides or back.

Two surveillance videos obtained from nearby houses reflected that, after the shooting, Jessica walked from Leal's house to the house of her sister, Anita Delgado, and then Delgado drove Jessica to their mother's house. Jessica did not seem to be panicked or rushed while she was walking. While at her mother's house, Jessica called 911, and a recording of this call was entered into evidence. During her 911 call, Jessica stated that she was at her house when her husband "tried to get [her] with a crow[bar]"[3] and she then pushed him down and stabbed him in the back or the side with a kitchen knife. She told the 911 operator that she was currently at her mother's house, that Leal was still at their house, and that she took his keys and left their house on foot because she was scared that he was going to chase her. Jessica stated that police officers were already at her and Leal's house, but she wanted to talk to police to explain what had happened. She also stated that they had separated, Leal had moved out, and she was trying to obtain a restraining order. The 911 call ended when police arrived at Jessica's mother's house. Jessica did not mention the presence of another person aside from herself and Leal at their house, and she did not mention that Leal had been shot.

---

[3]  Deputy Glover testified that he was told by investigators to search for a crowbar or a tire iron at the scene. He did not find either object at the house.

Deputy J. Vuong spoke with Jessica while she was at her mother's house, and Jessica informed him that the shooter—whom she identified as "Brion" or "Brione" Jackson—had stolen her car, a blue BMW sedan. Vuong issued a Be-On-the-Lookout, or "BOLO," notice for this car and gave a physical description of the suspect. Vuong did not see any injuries on Jessica when he spoke with her. Deputies took Jessica from her mother's house back to her house.

Deputy M. Jones, the primary homicide investigator assigned to this shooting, spoke with Jessica three times on January 13. During his first conversation with her, Jessica provided the name of "Brion Jones" as a suspect, and she later gave the names of "Brion Jackson," "Mike Jones," and "Cutta Jackson" as suspects. Deputy Jones showed her several pictures of men "obtained from different social media sites that were under Jessica Leal's account" in an attempt to identify the suspect. The trial court admitted these pictures into evidence, but Jones did not identify who the men in the pictures were. He stated, "[W]e knew we had a suspect, we just [were not] certain if those individuals were the actual suspect." Appellant's name had not been mentioned as a suspect, and Deputy Jones did not meet appellant until early the next morning.

Humble Police Department Officer J. Cox was on patrol around 11:00 p.m. on January 13, 2016, and was stopped behind a blue BMW sedan at an intersection. He ran the license plate of the car and an alert from the Harris County Sheriff's

Department popped up and listed the car as stolen. Cox and another officer conducted a traffic stop and encountered appellant. Cox spoke with Jessica by phone and informed her that appellant was driving her car. Jessica immediately informed Cox that appellant was her friend and that she had given him permission to drive her car. Appellant was calm and not combative during the traffic stop, and he did not appear surprised that the car had been listed as stolen. During the traffic stop, marijuana was discovered in appellant's possession, and he was arrested. After appellant was in custody, Deputy Jones and Sergeant S. Miller interviewed appellant early on the morning of January 14, 2016.

Deputy Glover processed Jessica's car for evidence two days after the shooting. He took swabs of the door handles, steering wheel, seat belt buckle, gear shift, and backrest of the driver's seat for DNA evidence. There were dry bloodstains in the car. In the trunk of the car, Glover photographed a trash bag that contained three smaller bags. These smaller bags contained a backpack, a pair of boots, a red shirt, black pants and a belt, and a pair of socks. The sole of the boots had a bloodstain that Glover swabbed. He sent the clothing to the Harris County Institute of Forensic Sciences for further processing.

DNA testing revealed that Leal could not be excluded as the sole contributor to the DNA profile from the bloodstains on the knife, the backrest of driver's seat of Jessica's car, and the sole of the boots found in the trunk of the car. With respect to

9

a bloodstain found on the driver's seat near the center console, there was a mixture of DNA profiles, and Leal could not be excluded as the possible major contributor, but no conclusion could be reached about the minor contributor. For the black pants recovered from Jessica's car, there was a mixture of DNA profiles, and appellant could not be excluded as the possible major contributor. Forensic scientists tested a different portion of one of the boots, and that portion revealed a mixture of three or more DNA profiles; appellant could not be excluded as a possible major contributor. Mixtures of DNA profiles were also found on the socks and the red shirt, and appellant could not be excluded as the possible major contributor for either of those items. Appellant also could not be excluded as the possible major contributor to a mixture of DNA profiles found on a swab of the gas pedals in Jessica's car.

## B. *Appellant's Custodial Statement*

Deputy Jones testified that he first heard of appellant after appellant was arrested while driving Jessica's car. Jones met with appellant after midnight on January 14. Appellant matched the general description of the suspect that Jessica had provided. Jones and the State had the following exchange:

| The State: | Now, at any point in time did you learn the relationship between Avery Jones and Jessica Leal? |
| --- | --- |
| Deputy Jones: | Yes. |
| The State: | And what was that? |
| Deputy Jones: | Girlfriend/boyfriend relationship. |

| | |
|---|---|
| The State: | And is this information that came from the defendant? |
| Deputy Jones: | Yes. |
| Defense counsel: | I'm going to object to that, You Honor. Can we approach? |
| The Court: | Yes. |
| Defense counsel: | It is—the answer— |
| The Court: | Okay. I'll sustain your objection. |
| Defense counsel: | I filed a motion in limine about statements of the defendant— |
| The Court: | I sustained your objection. Would you like an instruction? |
| Defense counsel: | I would like an instruction. |
| The Court: | At this time, ladies and gentlemen, you're instructed to disregard the previous question and the response between the prosecutor and the witness. |
| Defense counsel: | I move for a mistrial. |
| The Court: | Denied. |

The State then requested a hearing on the admissibility of appellant's statements to Deputy Jones, stating that he "want[ed] to talk about some of the things [appellant] said in there or didn't say, for that matter."

During a suppression hearing outside the presence of the jury, the trial court expressed frustration that it was just then learning that appellant had made a statement to police. Defense counsel stated, "So I have a lot to say, objections about the statement coming in, whether it was voluntary or involuntary." Deputy Jones

testified that he read appellant the *Miranda* warnings, that appellant audibly agreed that he understood the warnings, that Jones asked appellant if he wanted to talk, and appellant agreed to speak with Jones. Jones stated that the interview was recorded on video, that his reading of the *Miranda* warnings was on video, and that appellant never requested an attorney.

On cross-examination, defense counsel asked Jones whether appellant requested to terminate the interview "because he was exhausted and wanted to sleep." Jones recalled appellant saying on multiple occasions that he was tired, but he did not "remember him saying he wanted to terminate the interview." At this point, the trial court, still frustrated that it was just then hearing about appellant's statement, especially after it had granted defense counsel's motion in limine, paused the suppression hearing until the next day and directed the State to move on to another witness. Off the record, the trial court reviewed a redacted version of the interview.[4]

The suppression hearing continued the next morning, still outside the presence of the jury. The trial court watched an unredacted recording of the interview, frequently pausing the video to seek clarification of what appellant had said. During the hearing, the prosecutor stated that, in addition to appellant's statement to Deputy

---

[4] The following day, the trial court recounted on the record that it viewed a recording of the interview after it had excused the jury for the day, and while this occurred, defense counsel noticed that they were watching a redacted interview.

Jones that he was in dating relationship with Jessica, the prosecutor also wanted to ask Jones about appellant's demeanor, appellant's initial denial of being at Leal and Jessica's house, Jones's statement to appellant that Leal was on the phone at the time of the shooting, and appellant's response that he "knew that," a statement in which appellant "puts himself at the scene." Defense counsel then addressed her objections:

| | |
|---|---|
| Defense counsel: | I want to say that my client invoked his right to remain silent and his right to terminate the interview will be my first argument. |
| The Court: | At which point are you saying he's terminating the interview? |
| Defense counsel: | I'll show you. I have it written down. I have that at first he says he's cold. |
| The Court: | We've already heard that, this part. |
| Defense counsel: | Right. Second, it's 2:00 o'clock in the morning, he's been up all night and all day. |
| The Court: | "I just want to go to sleep." |
| Defense counsel: | He says—at 2:04 in the morning and 54 seconds, the officer says, Explain what happened today. He shakes his head no. He shakes his head no again at 2:05. |
| The Court: | Well, shaking his head no, that's—you know, that can mean, well, I don't know— |
| Defense counsel: | And then at 2:07, he yawns and says he wants to go to sleep. At 2:10, he again says, I just want to go to sleep. At 2:13, he's falling asleep and he says he wants to go to sleep. In that same context, around 2:13, I want to go to sleep, I'm tired. |
| | Officer tells him he won't have a bond. He then—he says several more times throughout the interview he wants to go home. At one point he asked, Do you |

13

have a warrant for my arrest in my name? I want to—if not, I want to go to sleep and leave, in those words, but he doesn't ever say I'm terminating the interview, which he's not required to do. But I think a culmination of all those facts, that he's freezing, he's exhausted, he's falling asleep in this interview.

Also I think there's evidence that he was arrested with marijuana in Humble while he's driving the car. He tells the officer there that he just bought marijuana, that he's high during this interview. I think it will be involuntary based on the culmination of all that information but you have to watch the whole interview before I can make that argument but if it helps you while you're watching it to see where my argument is.

The trial court continued watching the recording and continued to pause the recording occasionally to try to decipher what appellant said.

Ultimately, the trial court made a finding that the interview was voluntary up until the point appellant stated that he knew Leal was on the phone, noting that the State was "not interested in anything past this point." The State also agreed that it did not intend to play the recording of the interview for the jury and that it only intended to introduce, through Deputy Jones, appellant's statement about knowing Leal was on the phone. The trial court filed handwritten findings concerning the interview and its conclusion that the statement was voluntary.

In the presence of the jury, Deputy Jones testified that, during his interview with appellant, Jones mentioned that Leal was on the phone when he was shot. Jones testified that appellant responded, "I knew the dude was on the phone."

14

## C.    *Defensive Jury Instructions*

During cross-examination, Deputy Vuong testified that he took a statement from Anita Delgado, Jessica's sister. Defense counsel asked Vuong if he knew the difference between murder and justifiable homicide, and, while Vuong stated that he did, he could not articulate that difference. Defense counsel repeatedly asked Vuong if, based on Delgado's statement, he could tell if the shooting of Leal was a murder or a justifiable homicide, but the trial court sustained the State's objections to these questions. Vuong testified only that he conveyed Delgado's statement to investigators and that he thought it was important that the investigators know what Delgado had said, but he never testified as to the contents of Delgado's statement. Sergeant F. Garcia, who spoke with Delgado on a separate occasion, passed on what she said to the investigators. Defense counsel asked Garcia whether, after he spoke with Delgado, he was concerned that the shooting "could be a justified homicide," and he responded, "It was possible, yes." Garcia did not testify concerning what Delgado told him.

Defense counsel had the following exchange with Deputy Glover, the crime scene unit officer, on cross-examination:

Q:    Were you ever presented with a scenario to see if this evidence [at Leal's house] was consistent or not consistent with a self-defense situation?

A:    I wasn't. Well, as far as the—be more specific.

15

Q: Well, you were presented with a scenario and you were asked to see if the forensic evidence lines up with the situation that you were presented, correct?

A: Well—

Q: Is that correct?

A: I was—

Q: Is that correct?

A: Yes.

Q: So did anybody present you with a scenario that involved self-defense?

A: Yes.

Q: So you knew about a self-defense claim in this situation?

A: I knew about possible self-defense.

Q: All right. That's why I said "a claim," right?

A: Uh-huh.

Q: And what evidence in all these pictures contradicts that?

A: What contradicts that?

Q: Sure.

A: Well, there's no evidence that shows as far—well, the evidence on [Leal's] body shows that there are defensive wounds from—with a sharp object so—

Q: Does that mean that the body never had a weapon in his hand?

A: Well, we're—

Q: Does that—

A: We assume that the defensive wounds came from him protecting himself.

16

Glover agreed with defense counsel that, based on the scene, there was no "way to tell" whether Leal "was ever holding a weapon." Glover also agreed that he could not determine whether "there was another weapon at this scene other than a gun and a knife." Defense counsel also asked Glover questions about the positioning of the knife relative to the sink and asked whether that evidence was "consistent with a female and a male struggling over the knife near the sink." Glover agreed that it was possible. Glover also agreed that it was possible that a person could be standing in a closet that was connected to the master bathroom and "see that struggle with a knife." He further stated that, based on the location of the fired cartridge casings, it was possible that someone was inside the closet, fired a gunshot, "bust[ed] out of the closet," and stepped over Leal while continuing to shoot before leaving the house.

During the charge conference, that trial court stated that it intended to charge the jury without a self-defense instruction and noted that "the defense attorney is objecting to that charge and requesting defensive issues be included." Defense counsel and the trial court stated:

| | |
|---|---|
| Defense counsel: | My objection is that the language that was in the original charge given to me, which included self-defense, remain— |
| The Court: | The first draft of a charge? |
| Defense counsel: | The first draft, yes, Judge. And that's the one that I would like to go with. |

Defense counsel argued that self-defense had been raised by the evidence, specifically the officers who spoke to Delgado "that they heard a version of self-defense and that they thought it was credible enough to pass it along" to other investigating officers, as well as Glover's testimony that self-defense was "consistent with the physical evidence," and Garcia's testimony that "it could be self-defense in this fact scenario." The trial court refused to submit a self-defense instruction.

Ultimately, the jury found appellant guilty of the offense of murder and assessed his punishment at sixty years' confinement. This appeal followed.

**Refusal to Submit Defensive Instructions**

In his first issue, appellant contends that the trial court erred by failing to submit in the jury charge his requested instructions on self-defense and defense of a third person.

### A. *Standard of Review and Governing Law*

We review jury charge error in a two-step process. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). The first step is to determine whether there is error in the charge. *Id.*; *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If there is error and the defendant objected to the error at trial, we must reverse "if the error 'is calculated to injure the rights of the defendant,' which we have defined to mean that there is 'some harm.'" *Barrios*, 283 S.W.3d at 350 (quoting *Almanza v.*

18

*State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). We must determine whether the defendant suffered actual harm, rather than merely theoretical harm. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In determining harm, we consider the entire jury charge, the state of the evidence, including the contested issues and the weight of probative evidence, the argument of counsel, "and any other relevant information revealed by the record of the trial as a whole." *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011).

Code of Criminal Procedure article 36.14 provides that, in every felony case, the trial court shall deliver to the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14; *Beltran de la Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019) ("The purpose of the jury charge is to inform the jury of the applicable law and guide them in its application to the case.") (quoting *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996)). The trial court is required to instruct the jury on statutory defenses, affirmative defenses, and justifications when they are raised by the evidence. *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007); *see also* TEX. PENAL CODE ANN. § 2.03(c) ("The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense."), *id.* § 2.04(c) (stating same with respect to affirmative defenses).

A defendant is entitled to an instruction on every defensive issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the evidence is not worthy of belief. *Walters*, 247 S.W.3d at 209. When reviewing a trial court's decision to deny a requested defensive instruction, we view the evidence in the light most favorable to the defendant's requested submission. *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). A trial court errs in denying a requested defensive instruction if there is some evidence, from any source, which, when viewed in the light most favorable to the defendant, will support the elements of the defense. *Id.*; *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007) (stating that defense is raised by evidence "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true").

Texas Penal Code Chapter 9 is entitled "Justification Excluding Criminal Responsibility," and section 9.02 provides that "[i]t is a defense to prosecution that the conduct in question is justified under this chapter." TEX. PENAL CODE ANN. § 9.02. Two of the justification defenses provided for in Chapter 9 are self-defense and defense of a third person. A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful

20

force. *Id.* § 9.31(a). If the actor is justified in using force against another, the actor is also justified in using deadly force when and to the degree the actor reasonably believes deadly force is immediately necessary to protect against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a)(1), (a)(2)(A); *id.* § 9.01(3) (defining "deadly force" as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury"). The evidence does not have to show that the complainant was actually using or attempting to use unlawful deadly force "because a person has the right to defend himself from apparent danger as he reasonably apprehends it." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) (citing *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)).

A person is justified in using force or deadly force against another to protect a third person if (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or deadly force he reasonably believes to be threatening the third person he seeks to protect; and (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person. TEX. PENAL CODE ANN. § 9.33. The focus of this defense is "upon what the actor reasonably believes concerning the situation of the third person." *Morales v. State*, 357 S.W.3d 1, 8 (Tex. Crim. App. 2011). "In other words, a defendant is

justified in defending a third person if, under the circumstances as the defendant reasonably believes them to be, the third person would be justified in defending himself." *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016). Both self-defense and defense of a third person "require that there be a reasonable belief in the immediate need to act." *Id.*

Self-defense and defense of a third person are both "confession and avoidance" defenses. *See Jordan*, 593 S.W.3d at 343 (self-defense); *Henley v. State*, 454 S.W.3d 106, 114 (Tex. App.—Fort Worth 2014) (defense of third person), *rev'd on other grounds*, 493 S.W.3d 77 (Tex. Crim. App. 2016). In a case involving a confession and avoidance defense, an instruction on the defense is appropriate only when "the defendant's defensive evidence essentially admits to every element of the offense, including the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct." *Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013); *Shaw*, 243 S.W.3d at 659. Thus, to be entitled to instructions on confession and avoidance defenses such as self-defense and defense of a third person, the defendant must "admit to his otherwise illegal conduct." *Jordan*, 593 S.W.3d at 343; *Gamino*, 537 S.W.3d at 512 ("Admitting to the conduct does not necessarily mean admitting to every element of the offense."). A defendant "cannot both invoke self-defense and flatly deny the charged conduct." *Jordan*, 593 S.W.3d at 343; *Villa v. State*, 417 S.W.3d 455, 462 (Tex. Crim. App. 2013) ("If the defensive

22

evidence does no more than attempt to negate an element of the offense, a defendant is not entitled to a defensive instruction on any defense that is subject to the doctrine of confession and avoidance."); *Anderson v. State*, 11 S.W.3d 369, 372 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) ("Self-defense is inconsistent with a denial of the conduct. To raise the issue of self-defense, [a defendant] must admit the committed offense and then offer self-defense as justification.").

## B.    *Analysis*

Appellant argues that the record contains evidence supporting the theory that the shooting of Leal was a justifiable homicide and that he was therefore entitled to jury instructions on self-defense and defense of a third person. As supporting evidence, he points to (1) Sergeant Garcia's testimony that, after he spoke with Anita Delgado, Jessica's sister, he believed it was possible that the shooting was a justified homicide; (2) Deputy Glover's testimony that, based on the physical evidence present in the bathroom where Leal was killed, it was "possible" that a man and woman had been struggling over a knife in the bathroom and that a third person, who had been hiding in the attached closet, had started shooting upon seeing this struggle; and (3) Jessica's 911 call, in which she stated that Leal had come at her with a crowbar and she stabbed him with a kitchen knife to defend herself. We disagree that this evidence entitles appellant to jury instructions on self-defense and defense of a third person.

23

As stated above, both self-defense and defense of a third person are "justification" defenses that justify otherwise criminal conduct. They are also both "confession and avoidance" defenses, meaning that, to be entitled to the defense, the defensive evidence must "essentially admit[] to every element of the offense, including the culpable mental state, but interpose[] the justification to excuse the otherwise criminal conduct." *Cornet*, 417 S.W.3d at 451; *Shaw*, 243 S.W.3d at 659. To be entitled to an instruction on a confession and avoidance defense, the defendant must "admit to his otherwise illegal conduct."[5] *Jordan*, 593 S.W.3d at 343. Here, there is no evidence in the trial record in which appellant admits to the illegal conduct of shooting Leal.

---

[5] We do not hold that, to be entitled to an instruction on a confession and avoidance defense, the defendant himself must testify and admit on the witness stand to the otherwise criminal conduct. Recent cases from the Court of Criminal Appeals have held that "the defensive evidence" must essentially admit every element of the offense. *See, e.g.*, *Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013); *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007). This evidence could take the form of, for example, statements made by the defendant during a custodial interrogation or testimony from a defensive witness who saw the defendant commit the otherwise criminal conduct. *See, e.g.*, *Davis v. State*, 490 S.W.3d 268, 276 (Tex. App.—Fort Worth 2016, pet. ref'd) (considering statements made by defendant in custodial interrogation in concluding that defendant did not sufficiently admit culpability in robbery offense and therefore he was not entitled to instruction on necessity, which is also a confession and avoidance defense); *see also VanBrackle v. State*, 179 S.W.3d 708, 713–14 (Tex. App.—Austin 2005, no pet.) (considering, in determining whether some evidence existed in record raising issue of self-defense when defendant did not testify at trial, testimony from both State and defense witnesses concerning altercation that formed basis of underlying charge).

Sergeant Garcia testified that he spoke with Delgado, Jessica's sister, after the shooting, and that he passed on what she said to the investigators. Based on what Delgado told him, Garcia believed that it was "possible" that the shooting of Leal was justified. Garcia did not testify concerning the contents of Delgado's statement to him. Deputy Glover, with the crime scene unit, processed the scene of the shooting for physical evidence. He agreed that, when investigating the scene, he had been presented with a scenario involving a self-defense claim to consider. He testified that he assumed Leal's defensive wounds were the result of him trying to protect himself, and he agreed that he could not tell, based on the evidence at the scene, whether Leal had held a weapon. Defense counsel asked Glover about the positioning of the knife found next to Leal relative to the bathroom sink and asked whether that evidence was "consistent with a female and a male struggling over the knife near the sink." Glover agreed that this was possible. He also agreed that it was possible that a person could have been standing in the closet connected to the master bathroom and could have seen "that struggle with a knife." He further stated that, based on the location of the fired cartridge casings, it was possible that someone inside the closet fired a gunshot, "bust[ed] out of the closet," and stepped over Leal while continuing to shoot him.

Neither Sergeant Garcia's testimony nor Deputy Glover's testimony specifically mentions appellant or constitutes an admission by appellant that he

committed the shooting, let alone that he acted in self-defense or that he was defending another person when he did so. This evidence amounts to nothing more than the mere possibility that the shooting occurred in self-defense or to defend another; it is not evidence that satisfies the elements of self-defense or defense of a third person. *See Shaw*, 243 S.W.3d at 657–58 (stating that defense is raised by evidence "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true").

With respect to her 911 call, Jessica told the 911 dispatcher that she had had an argument with Leal, her husband, at their house. Leal "tried to get [her] with a crow[bar]," or some other instrument that she did not know the name of, but she pushed him down and stabbed him in the back or the side with a kitchen knife. She stated that she took Leal's keys and left their house on foot to go to her mother's house because she was afraid that he was going to chase her. She mentioned that they had been having marital problems, and she stated that she had tried to get a restraining order. Jessica did not mention that Leal had been shot, she did not mention the presence of a third person at their house, and she did not mention appellant in her 911 call. Jessica's 911 call, which does not reference appellant, let alone reference any actions that he may have taken at Leal's house, also does not

constitute an admission by appellant that he committed the shooting, nor is it evidence that even placed him at the scene of the crime.

To be entitled to jury instructions on self-defense and defense of a third person, defensive evidence must admit to "every element of the offense, including the culpable mental state, but interpose[] the justification to excuse the otherwise criminal conduct." *Cornet*, 417 S.W.3d at 451; *Shaw*, 243 S.W.3d at 659. There is no evidence in this record in which appellant admits that he committed the criminal conduct—the shooting of Leal. Because no such admission was presented to the jury, we conclude that appellant was not entitled to jury instructions on self-defense and defense of a third person, two "confession and avoidance" defenses. *See Jordan*, 593 S.W.3d at 343 ("Self-defense is a confession-and-avoidance defense requiring the defendant to admit to his otherwise illegal conduct."); *Anderson*, 11 S.W.3d at 372 ("Self-defense is inconsistent with a denial of the conduct. To raise the issue of self-defense, [a defendant] must admit the committed offense and then offer self-defense as justification."). We hold that the trial court did not err by denying appellant's requested jury instructions on these two defenses.

We overrule appellant's first issue.

**Voluntariness of Defendant's Statement**

In his second issue, appellant contends that the trial court erred in denying his motion to suppress Deputy Jones's testimony that, during a custodial interrogation,

appellant stated that he "knew the dude [Leal] was on the phone" because the custodial interrogation was involuntary and coercive under Code of Criminal Procedure articles 38.21 and 38.22, *Miranda v. Arizona*, and state and federal due process protections.

## A. *Standard of Review*

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018). We view the evidence in the light most favorable to the trial court's determination, and we will reverse only if the ruling is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). Because the trial court is the sole trier of fact at a suppression hearing, we give almost total deference to the court's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35 (Tex. Crim. App. 2017); *Story*, 445 S.W.3d at 732; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) ("The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony."). The trial court is entitled to believe or disbelieve all or any part of a witness's testimony, even if that testimony is uncontroverted, because the court has the opportunity to observe the witness's

28

demeanor and appearance. *Valtierra*, 310 S.W.3d at 447. This deferential standard of review also applies to a trial court's determination of historical facts based on a videotape recording admitted into evidence at a suppression hearing, although we may review de novo "'indisputable visual evidence' contained in a videotape." *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) (quoting *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000)); *State v. Fikes*, 585 S.W.3d 636, 641 (Tex. App.—Austin 2019, no pet.).

If the trial court makes express findings of fact, we view the evidence in the light most favorable to its ruling and determine whether evidence supports the fact findings. *Valtierra*, 310 S.W.3d at 447. If the trial court does not make express factual findings, we still view the evidence in the light most favorable to the ruling, and we assume that the trial court made implied findings of fact that support its ruling as long as those findings are supported by the record. *Ramirez-Tamayo*, 537 S.W.3d at 35–36 (quoting *Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006)).

We review de novo the trial court's application of the law to facts that do not turn on credibility and demeanor. *Story*, 445 S.W.3d at 732; *see Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013) ("[A] question 'turns' on an evaluation of credibility and demeanor 'when the testimony of one or more witnesses, if believed, is *always* enough to add up to what is needed to decide the substantive issue.'")

(quoting *Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998)). We will uphold the trial court's ruling if the decision is correct under any theory of applicable law. *Cortez*, 543 S.W.3d at 203.

## B.     *Voluntariness of Defendant's Statement*

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V; TEX. CONST. art. I, § 10 (providing that, in all criminal prosecutions, accused "shall not be compelled to give evidence against himself"), § 19 (providing that no citizen of Texas shall be deprived of liberty "except by the due course of the law of the land"). In *Miranda v. Arizona*, the United States Supreme Court required procedural safeguards to protect this right and provided that, during a custodial interrogation, the accused must be warned prior to any questioning that, among other things, he has the right to remain silent, anything he says can be used against him in court, and he has the right to have an attorney present during the interrogation. 384 U.S. 436, 478–79 (1966). After the accused has received these warnings and has had the opportunity to exercise his rights, he may knowingly and intelligently waive his rights and agree to answer questions or make a statement. *Id.* at 479. Until the State demonstrates that the warnings were given and the accused waived his rights, "no evidence obtained as a result of interrogation can be used against him." *Id.*

Texas has expanded on these rights by statute. Code of Criminal Procedure article 38.21 provides that "[a] statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21; *Williams v. State*, 402 S.W.3d 425, 433 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). Article 38.22 governs when written and oral statements of an accused may be used at trial. Section 2 of that article, specifically addressing written statements, provides:

> No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:
>
> (a) the accused, prior to making the statement, . . . received from the person to whom the statement is made a warning that:
>
> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2) any statement he makes may be used as evidence against him in court;
>
> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5) he has the right to terminate the interview at any time; and
>
> (b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily

> waived the rights set out in the warning prescribed by Subsection (a) of this section.

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2. Article 38.22, section 3 governs oral statements and provides that no oral statement of an accused, made as a result of custodial interrogation, shall be admissible unless, among other requirements, "prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning." *Id.* art. 38.22, § 3.

Article 38.22 also includes procedural requirements that must be met when the defendant raises a question about the voluntariness of the statement:

> In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause. . . . Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof. . . .

*Id.* § 6; *Oursbourn v. State*, 259 S.W.3d 159, 171 (Tex. Crim. App. 2008) (stating that article 38.22, section 6 "applies to *both* an accused's custodial and non-custodial statements because it provides that only 'voluntary' statements may be admitted").

A defendant may claim that his statement was not freely and voluntarily made under several different theories: (1) "general voluntariness" under article 38.22, section 6; (2) *Miranda*, as expanded by article 38.22 sections 2 and 3; or (3) the Due Process Clause, and a statement "may be involuntary under one, two, or all three theories." *Oursbourn*, 259 S.W.3d at 169; *Ramjattansingh v. State*, 587 S.W.3d 141, 153 (Tex. App.—Houston [1st Dist.] 2019, no pet.). "A statement that is 'involuntary' as a matter of constitutional law is also 'involuntary' under Article 38.22, but the converse need not be true." *Oursbourn*, 259 S.W.3d at 169.

The State bears the burden of establishing a valid waiver of *Miranda* rights by a preponderance of the evidence. *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). The Court of Criminal Appeals has held that "[t]here are two facets to any inquiry" regarding the adequacy of a waiver of an accused's *Miranda* rights:

> First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Id.* (quoting *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001)). For a waiver of a *Miranda* right to be involuntary "there must be some element of official intimidation, coercion, or deception." *Id.*; *Oursbourn*, 259 S.W.3d at 169–70 (stating that confession is "voluntary" within meaning of Due Process Clause "absent some coercive police activity" causally related to confession).

A waiver is knowing and intelligent if the accused "has been made aware, and fully comprehends, that he has the right to remain silent in the face of police interrogation and to discontinue the dialogue at any time, and that the consequence of his waiver is that his words may be used against him later in a court of law." *Leza*, 351 S.W.3d at 350. "The Due Process Clause is aimed at protecting suspects from police overreaching, not at protecting people from themselves or other private actors." *Oursbourn*, 259 S.W.3d at 170. Claims of involuntariness under the Due Process Clause and *Miranda* "do not require 'sweeping inquiries into the state of mind of a criminal defendant who has confessed,'" but instead involve "an objective assessment of police behavior." *Id.* at 171 (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

For Fifth Amendment purposes, an accused's waiver of the privilege against compelled self-incrimination during custodial interrogation is involuntary "only if it is a product of official coercion, intimidation, or deception." *Leza*, 351 S.W.3d at 352. However, a claim that a waiver of the statutory rights set out in article 38.22 is involuntary "need not be predicated on police overreaching." *Id.* (quoting *Oursbourn*, 259 S.W.3d at 172). Claims of involuntariness under article 38.22 can involve police overreaching, but these claims can also involve inquiries into the accused's state of mind that are not relevant to due process claims. *Oursbourn*, 259 S.W.3d at 172. "Circumstances unattributable to the police that nevertheless

adversely impact an accused's ability to resist reasonable police entreaties to waive his statutory rights, such as intoxication, are 'factors' in the voluntariness inquiry, though they 'are usually not enough, by themselves, to render a statement inadmissible under Article 38.22.'" *Leza*, 351 S.W.3d at 352 (quoting *Oursbourn*, 259 S.W.3d at 173); *see Oursbourn*, 259 S.W.3d at 172–73 (stating that while youth, intoxication, illness, medication, and mental and intellectual disabilities are usually not enough, by themselves, to hold that confession is involuntary, they are factors that may be considered).

We consider the totality of the circumstances in determining whether an accused's statement was voluntary. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007); *Allen v. State*, 479 S.W.3d 341, 350 (Tex. App.—El Paso 2015, no pet.); *see also Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (stating that totality-of-circumstances approach requires consideration of "all the circumstances surrounding the interrogation," including accused's experience, background, and conduct) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

## C.    *Analysis*

Appellant argues that his entire interview with Deputy Jones and Sergeant Miller was involuntary—and thus should have been suppressed—because he was cold, the interview occurred early in the morning and he had not slept, he was

possibly under the influence of marijuana at the time, and he invoked his right to remain silent and terminate the interview.

The suppression hearing in this case occurred over two days. At the beginning of the hearing, Deputy Jones testified that he and Sergeant Miller interviewed appellant after the Humble Police Department arrested him for possession of marijuana. Appellant had been stopped while driving Jessica's car, which she had reported as stolen, although she informed the arresting officer that appellant had permission to drive her car. Jones testified that he read appellant the *Miranda* warnings, appellant responded that he understood the warnings, and appellant agreed to talk with the detectives. The trial court viewed an unredacted recording of appellant's interrogation and discussed with counsel various statements that appellant made throughout the interview.

After the suppression hearing, the trial court made the following handwritten findings concerning the voluntariness of the interrogation:

Prelim. Finding—[Defendant's] Statement was Voluntary

Hearing Outside Presence of Jury began Wed., 8/29/18 & continued Thurs. 8/30/18

Murder offense date: morning of 1/13/16
[Defendant's] arrest: approx. 11pm same day
Interview: approx. 2am 1-14-16

Defendant was arrested driving deceased's vehicle, which had been reported stolen from their driveway by deceased's wife, Jessica Leal. (She was later charged as a co-defendant in the murder of her husband.)

36

HCSO Deputy [M.] Jones interviewed Defendant at the Humble Police Dept. near where he had been stopped in the vehicle that had been reported stolen and also was in possession of marihuana.

Jones gave Defendant his Miranda warnings & after each Defendant indicated he understood. There was a lengthy interview.

There were times when Defendant, on a particular subject matter being discussed by the interviewer(s), would say he didn't want to talk about it (whatever the subject was) anymore, but would continue to respond.

There were occasions when defendant would say he wanted to go to sleep, or would inquire about a bond, or whether there was a warrant for his arrest, but he continued to participate. He would say, as to a matter, "I got nothing else to say," but talked fairly freely about staying at a hotel with deceased's wife, about her kids, that his work was that he "does music," etc.

The only statement during the entire interview that the State presented before the jury was the Defendant indicating that the deceased, on the morning of 1/13/16, was on the phone.[6]

Defendant never asked for an attorney.

Conclusion: The statement by the defendant was voluntarily made.

A review of appellant's interrogation with Jones and Miller reflects that the interview began around 1:48 a.m. on January 14, 2016. At the beginning of the interview, Deputy Jones read appellant each of the *Miranda* warnings, appellant verbally indicated that he understood each of the warnings, and appellant agreed to speak with the detectives. Early in the interview, appellant stated that he was cold,

---

[6]    Because the State represented that the only statement of appellant's that it wished to introduce into evidence was appellant's statement that he knew Leal was on the phone, which occurred approximately one hour and four minutes into the interview, the trial court did not consider anything that happened in the interview after this point in determining whether the statement was voluntarily made.

37

and this was the only such reference to the conditions in the interview room that he made.[7] Appellant yawned several times throughout the interview; approximately nineteen minutes into the interview he asked if he could go to sleep; and he stated on at least three other occasions, "I just want to go to sleep." Despite these statements, appellant did not fall asleep while talking to Jones and Miller, and there is no indication on the recording that he was having difficulty staying awake. Appellant did not state, during the interview, that he had smoked or otherwise ingested marijuana.[8]

Appellant occasionally answered questions during the interview. He told the detectives that he knew Jessica, that she had been his girlfriend for around one month, and that they had met through social media. He answered questions about his use of Jessica's car, at one point correcting one of the detectives and stating that Jessica had lent her car to him "yesterday." He informed detectives that he and

---

[7]     Appellant's interview occurred in mid-January. He was wearing a hooded sweatshirt during his interview. Both detectives were wearing dress shirts without suit jackets.

[8]     It is undisputed that when Officer Cox arrested appellant at 11:14 p.m., appellant had marijuana in his possession. During the suppression hearing, defense counsel stated, "Also, I think there's evidence that [appellant] was arrested with marijuana in Humble while he's driving the car. He tells the officer there that he just bought marijuana, that he's high during this interview." Cox's incident report, which was admitted into evidence for the purpose of the suppression hearing, included this statement: "[Appellant] stated that he was headed home to Kenswick from a friend[']s house where he purchased marijuana." The report did not include any indications that appellant had stated that he was under the influence of marijuana at the time of his arrest. Cox did not mention marijuana when he testified before the jury, and he did not testify during the suppression hearing.

38

Jessica had spent the night—presumably the night before the shooting—together at a hotel, although he refused to tell the detectives which hotel because he did not believe it was important. He answered questions about Jessica's children and his own daughter. He also talked about his work, which he described as "doing music." Appellant also participated in the interview by asking questions of the detectives. He asked questions about the amount of his bond, several questions either clarifying or summarizing statements that Jessica had allegedly made to the detectives, a question about an arrest warrant, and a question about whether Jessica was at the scene when the police arrived.

The detectives repeatedly asked appellant questions about what happened with Leal—questions such as "explain what happened today" and questions about who had possession of the gun and who had the knife. Appellant did not answer these questions. He either remained silent or shook his head. Approximately fifty minutes into the interview, at 2:38 a.m., he mentioned that he would rather go home, and he said something like, "No matter what I say it won't change anything." Three minutes later, he asked the detectives questions about Jessica's story, and one of the detectives asked, "So she gave you the car?" Appellant said something along the lines of "I'm not speaking on that," but he immediately continued talking. The detectives asked him, "Before you left [Jessica and Leal's house], her husband showed up. Is that true?" Appellant did not answer. Ten minutes later, at 2:51 a.m.,

an hour and four minutes into the interview, Deputy Jones told appellant that they knew Leal was on the phone at the time of the shooting, that they had the phone call and "people in the background," and that they "know who was there." Appellant responded, "I did know he was on the phone."

To the extent appellant argues that the interview in its entirety—and his statement that he knew that Leal was on the phone, in particular—was involuntary because he was cold, he was extremely fatigued, and he was possibly under the influence of marijuana at the time of the interview, we disagree that these factors adversely impacted appellant's ability to comprehend the *Miranda* warnings and to "resist reasonable police entreaties to waive his statutory rights." *See Leza*, 351 S.W.3d at 352. Although it is apparent from the recording that appellant was tired during the interview, he did not express any confusion over his rights when Deputy Jones read him his *Miranda* warnings. Instead, appellant agreed that he understood each of the rights, and he agreed to talk with the detectives. Appellant participated throughout the interview, occasionally answering questions and asking questions of his own. His questions and answers, although sometimes hard to hear due to his quiet voice and propensity to mumble, followed logically from the flow of the interview. Appellant routinely declined to answer questions that would have placed him at the scene of the shooting, until he stated that he knew that Leal was on the phone. We conclude that the cold, appellant's fatigue, and his possible use of marijuana before

the interview did not render his statement involuntary. *See id.*; *Oursbourn*, 259 S.W.3d at 172–73.

Appellant also argues that his statement was involuntary because he invoked his right to remain silent and sought to terminate the interview, but the detectives continued questioning him. If an individual in custody "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (quoting *Miranda*, 384 U.S. at 473–74); *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996) ("If a statement is governed by *Miranda* (i.e. the suspect is in custody), then a failure to cut off questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statements inadmissible."). A suspect is not required to use any particular language to invoke the right to remain silent. *Ramos*, 245 S.W.3d at 418. However, the officer "need not stop his questioning unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous remarks." *Id.* (quoting *Dowthitt*, 931 S.W.2d at 257); *Parlin v. State*, 591 S.W.3d 214, 221 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("If the suspect's statement is not an unambiguous or unequivocal request to terminate the interview or to invoke the right to silence, then the officers have no obligation to stop questioning him."); *Beham v. State*, 476 S.W.3d 724, 731 (Tex. App.—Texarkana 2015, no pet.) ("The suspect's comments

must 'clearly manifest his desire to remain silent.'") (quoting *Mayes v. State*, 8 S.W.3d 354, 358 (Tex. App.—Amarillo 1999, no pet.)). "[A]nything less than a clear manifestation does not obligate the officer to stop the interrogation." *Mayes*, 8 S.W.3d at 358–59.

In determining whether the defendant unambiguously invoked his right to remain silent, we look at the totality of the circumstances. *Parlin*, 591 S.W.3d at 221; *Williams v. State*, 257 S.W.3d 426, 433 (Tex. App.—Austin 2008, pet. ref'd); *see Beham*, 476 S.W.3d at 731–32 ("The totality of circumstances surrounding the interrogation and alleged invocation must illustrate that the suspect actually invoked his right."). "Ambiguity exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances." *Parlin*, 591 S.W.3d at 221; *Williams*, 257 S.W.3d at 433.

As discussed above, on several occasions during the interview appellant stated that he was tired or that he "just wants to go to sleep." Appellant also asked questions about whether he would get a bond and whether there was a warrant for his arrest. Around fifty minutes into the interview, he said something that sounded like, "I'd rather go home" and "No matter what I say it won't change anything." Appellant continued participating in the interview, and he asked the detectives questions about what Jessica had allegedly said in her interview. One of the detectives then asked

him, "So she gave you the car?" Appellant said, "I'm not speaking on that," but he immediately continued speaking, and he talked about his relationship with Jessica.

In *Dowthitt*, the Court of Criminal Appeals held that the defendant's statement that "I can't say more than that[;] I need to rest" was not an unambiguous invocation of his right to remain silent. *See* 931 S.W.2d at 257. The court reasoned that, instead, the defendant's statement "merely indicates that he believed he was physically unable to continue—not that he desired to quit." *Id.*; *see Franks v. State*, 90 S.W.3d 771, 786–87 (Tex. App.—Fort Worth 2002, no pet.) (holding that defendant's statement of "I don't want to talk anymore. I'm tired" did not unambiguously invoke right to remain silent and therefore officer did not violate defendant's rights by continuing interrogation); *see also Hargrove v. State*, 162 S.W.3d 313, 319–20 (Tex. App.—Fort Worth 2005, pet. ref'd) (holding that defendant did not unambiguously request to terminate interview when he said, "Let's just terminate it" and, in response to officer questioning him about whether he wanted to stop, he stated, "Why should we go on because I'll be spinning my wheels. You're spinning your wheels," but defendant did not answer question about whether he wanted to stop, he continued speaking, and he "never again requested to terminate the interview"). In contrast, the Court of Criminal Appeals has held that the suspect's statement that he "didn't want to talk to [the interrogating officer]. That he didn't want to talk about it anymore" was "an unambiguous, unequivocal, and unqualified assertion of his right to remain

43

silent." *Ramos*, 245 S.W.3d at 413, 418–19; *see Cooper v. State*, 961 S.W.2d 222, 226 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (holding that defendant unambiguously invoked his right to terminate interview when he stated, "I'm not answering any questions," and defendant "continued to invoke that right throughout the remainder of the video").

We conclude that appellant's statements to the detectives were more like those made by the suspects in *Dowthitt*, *Franks*, and *Hargrove* rather than the suspects' statements in *Ramos* and *Cooper*, and we agree with the trial court that appellant did not unambiguously invoke his right to remain silent or request to terminate the interview. Appellant's statements that he was tired and he wanted to go to sleep were ambiguous and did not clearly express a desire to stop speaking with the officers. *See Dowthitt*, 931 S.W.2d at 257; *Franks*, 90 S.W.3d at 786–87. Appellant's statements that he would "rather go home" because "no matter what I say it won't change anything" is similar to the defendant's statement in *Hargrove*—"Let's just terminate it" because he believed he was "spinning [his] wheels"—which the Fort Worth Court of Appeals held was ambiguous, especially because the defendant continued speaking with the officer. *See* 162 S.W.3d at 319–20. Furthermore, although appellant stated, "I'm not speaking on that," in response to a question about his use of Jessica's car, he immediately continued speaking with the detectives and gave them further information about his relationship with Jessica. *See Mayes*, 8

44

S.W.3d at 359 ("By stating that she did not know if she wanted to talk, [the defendant], at best, expressed ambivalence toward waiving her rights. But, by following that statement with more speech, separated by little more than a breath, it is clear she resolved her dilemma; in short, she wanted to talk.").

As the trial court noted in its written findings, appellant participated in the interview, spoke "fairly freely" about certain topics, and, with respect to other topics, would state that he did not want to talk about that topic, or he would not answer the detectives' questions on that topic. Considering the totality of the circumstances, we conclude that appellant did not unambiguously invoke his right to remain silent or his right to terminate the interview prior to his statement to the detectives that he knew Leal was on the phone. *See Parlin*, 591 S.W.3d at 221; *Williams*, 257 S.W.3d at 433. We therefore hold that the trial court did not abuse its discretion when it concluded that appellant's statement was voluntary and refused to suppress the statement. *See Cortez*, 543 S.W.3d at 203 (stating that we review rulings on motions to suppress for abuse of discretion); *Delao*, 235 S.W.3d at 239 (stating that we consider totality of circumstances in determining whether statement was voluntary).

We overrule appellant's second issue.

### Motion for Mistrial

In his third issue, appellant contends that the trial court erred by denying his motion for mistrial made after the State violated a motion in limine. Specifically,

defense counsel had requested that the State not mention that appellant had made a statement to police until after a motion to suppress could be heard outside the presence of the jury. Appellant contends that the State violated this motion by asking Deputy Jones if the information that appellant and Jessica were in a dating relationship came from appellant. The trial court sustained appellant's objection and instructed the jury to disregard Jones's answer, but it denied appellant's motion for mistrial.

## A.    *Standard of Review*

A mistrial "is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009). A mistrial is an appropriate remedy "in extreme cases for a narrow class of highly prejudicial and incurable errors." *Turner v. State*, 570 S.W.3d 250, 268 (Tex. Crim. App. 2018); *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Ordinarily, a prompt instruction to disregard is sufficient to cure error associated with an improper question and answer. *Pena v. State*, 554 S.W.3d 242, 250 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd); *Perez v. State*, 187 S.W.3d 110, 113 (Tex. App.—Waco 2006, pet. ref'd) ("An instruction to disregard is presumptively inadequate only in the most blatant cases; only offensive or flagrant improper conduct warrants reversal when there has been an instruction to disregard . . . ."). "We generally

presume the jury follows the trial court's instructions in the manner presented." *Garcia v. State*, —S.W.3d—, No. PD-0035-18, 2019 WL 6167834, at *7 (Tex. Crim. App. Nov. 20, 2019) (quoting *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998)). Mistrials should only be granted in cases where the error "was clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds." *Young*, 283 S.W.3d at 878.

We review a trial court's ruling denying a motion for mistrial for an abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). We view the evidence in the light most favorable to the trial court's ruling, and we consider only those arguments that were before the court at the time of the ruling. *Turner*, 570 S.W.3d at 268. We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.* Whether an error requires a mistrial must be determined by the particular facts of the case. *Ocon*, 284 S.W.3d at 884. Because a mistrial is an extreme remedy, mistrials should be granted "'only when residual prejudice remains' after less drastic alternatives are explored." *Id.* at 884–85 (quoting *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. App.—Fort Worth 2005), *aff'd*, 189 S.W.3d 272 (Tex. Crim. App. 2006)); *see Jenkins v. State*, 493 S.W.3d 583, 612 (Tex. Crim. App. 2016).

## B.    *Analysis*

Deputy Jones testified that he first learned of appellant after he was stopped by Officer Cox while driving Jessica's car. Appellant had not previously been mentioned during the investigation. Deputy Jones and the State had the following exchange:

| | |
|---|---|
| The State: | Now, at any point in time did you learn the relationship between Avery Jones and Jessica Leal? |
| Deputy Jones: | Yes. |
| The State: | And what was that? |
| Deputy Jones: | Girlfriend/boyfriend relationship. |
| The State: | And is this information that came from the defendant? |
| Deputy Jones: | Yes. |
| Defense counsel: | I'm going to object to that, Your Honor. Can we approach? |
| The Court: | Yes. |
| Defense counsel: | It is—the answer— |
| The Court: | Okay. I'll sustain your objection. |
| Defense counsel: | I filed a motion in limine about statements of the defendant— |
| The Court: | I sustained your objection. Would you like an instruction? |
| Defense counsel: | I would like an instruction. |
| The Court: | At this time, ladies and gentlemen, you're instructed to disregard the previous question and the response between the prosecutor and the witness. |
| Defense counsel: | I move for a mistrial. |

The Court:        Denied.

The State then requested that the trial court hold a hearing on the admissibility of appellant's statements to the detectives, and the trial court began the suppression hearing.

It is well established that motions in limine do not preserve error, regardless of whether the motion is granted or denied. *Webb v. State*, 760 S.W.2d 263, 275 (Tex. Crim. App. 1988); *Wert v. State*, 383 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A ruling on a motion in limine is, therefore, not a ruling on the merits, but is instead a ruling regarding the administration of the trial. *Lusk v. State*, 82 S.W.3d 57, 60 (Tex. App.—Amarillo 2002, pet. ref'd); *Harnett v. State*, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref'd). As such, the remedy for a violation of a ruling on a motion in limine rests with the trial court. *Lusk*, 82 S.W.3d at 60 (citing *Brazzell v. State*, 481 S.W.2d 130, 131 (Tex. Crim. App. 1972)). The remedy of instructing the jury to disregard testimony elicited in violation of a motion in limine is "one of the broad range of remedies available to the trial court in exercising its discretion as to conduct of the trial." *Id.* at 61–63 (assuming that testimony concerning extraneous offenses, elicited in violation of motion in limine, was inadmissible, but holding that testimony was not such that prejudicial effect of evidence could not have been cured by instruction to disregard and, therefore, trial court did not abuse its discretion in denying motion for mistrial).

The State acknowledges that, by asking Deputy Jones if the information that appellant and Jessica were in a dating relationship came from appellant, it violated the trial court's ruling on appellant's motion in limine, which required the State to approach the bench before eliciting testimony concerning any recorded statements that appellant made to the detectives. It argues, however, that the trial court did not abuse its discretion by denying appellant's motion for mistrial. We agree.

In questioning Deputy Jones, the State elicited testimony that appellant and Jessica were in a dating relationship, and Jones testified that this information came from appellant. The trial court sustained appellant's objection to this testimony and instructed the jury to disregard the State's previous question and Deputy Jones's response. The information elicited by the State is not so "offensive or flagrant" that the trial court's instruction to disregard could not cure any prejudicial effect arising from the testimony. *See Perez*, 187 S.W.3d at 113; *see also Pena*, 554 S.W.3d at 250 (stating that, ordinarily, prompt instruction to disregard is sufficient to cure any error arising out of improper question and answer). Moreover, Mary Lou Nimmons, Leal's sister, had already testified that "Avery" was "one of Jessica's boyfriends" and that appellant was one of the men Jessica "was around" during the time she and Leal were separated. Thus, the substance of the testimony elicited from Deputy Jones was already properly before the jury. *See Harris v. State*, 164 S.W.3d 775, 783 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) ("[I]nadmissible evidence can be

50

rendered harmless if other evidence is admitted at trial without objection and it proves the same fact that the inadmissible evidence sought to prove.") (quoting *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991)); *see also Rogers v. State*, 200 S.W.3d 233, 238 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) ("[E]ven assuming that the trial court erred in refusing the mistrial, such error would be harmless because other evidence that [the defendant] violated a protective order was admitted without objection.").

The trial court had before it a broad range of remedies available to address the State's violation of its motion in limine ruling, including instructing the jury to disregard the testimony elicited in violation of the ruling. *See Lusk*, 82 S.W.3d at 63. We conclude that the objected-to question and answer in this case does not fall within the "narrow class of highly prejudicial and incurable errors" such that a mistrial was required. *See Turner*, 570 S.W.3d at 268; *Ocon*, 284 S.W.3d at 884–85 (stating that mistrial is "extreme remedy" that should be granted "'only when residual prejudice remains' after less drastic alternatives are explored"). We hold that the trial court did not abuse its discretion in denying appellant's motion for mistrial.

We overrule appellant's third issue.[9]

---

[9] We further note that, ultimately, after the suppression hearing, the trial court ruled that appellant's statement to the detectives was voluntary up until appellant's statement that he knew Leal was on the phone, which occurred roughly one hour

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Lloyd, and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).

---

into the recording of his interrogation. Appellant first acknowledged that he and Jessica had a dating relationship approximately two minutes after the detectives read him his *Miranda* warnings.